Bill Dee SMITH, Appellant,

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 86–SC–43–MR.**

Supreme Court of Kentucky.

Sept. 3, 1987.

Rehearing Denied Nov. 5, 1987.

Daniel T. Goyette, Jefferson Dist. Public Defender, Frank W. Heft, Jr., Louisville, for appellant.

David L. Armstrong, Atty. Gen., Gerald Henry, Asst. Atty. Gen., Frankfort, for appellee.

VANCE, Justice.

The appellant was convicted of wanton murder and sentenced to imprisonment for a period of 25 years. He claims on appeal

that there was no evidence of wantonness and that the trial court erred by giving an instruction on wanton murder. He further claims that the trial court erred in refusing to instruct on first-degree manslaughter.

The victim, Bill Dupin, was shot and killed in a deserted spot underneath the K & I Bridge on the Ohio River bank in Jefferson County, Kentucky. Shortly thereafter, the appellant gave a statement to the police in which he admitted the shooting. Edna Thompson, a woman with whom he was living, also gave a statement that appellant did the shooting. Both statements were recorded and transcribed.

In his statement to the police, appellant described the shooting as follows:

"Smith Okay. The best I can remember is ... the best I can remember is she, she got her own way down to Bill Dupin's. I can't remember taking her down there. And when I went down ... I went down to pick her up. He was gone, but she was at Rosetta's and that's when I picked her up and I ... that's when I asked her if she could get him under the bridge, K & I Bridge where the main road is. She said she didn't know. She guess she could. She didn't really know. So, that's, that's when I took ... I went down under the K & I Bridge with her and showed her where I would be for her to bring him if she could. Okay. And then, that's when ... when I took her back and dropped her off at Aunt Rosetta's or I dropped her off around the corner. And uh, I went on back down. I waited for them to come down there. I was ... that's when I was waitin' down there for about a half an hour for them to come down there. Then, they show up. I'm waitin' in the ditch just kind of side there, alongside where they pulled up in the truck. And then, and then, that's when I waited a couple of minutes and then I went up the side, behind at the side of the truck on the driver's side where he was. And that's when she shined the flashlight in my eyes and opened the door. He had his pants down and I already had my gun pointed at him. And that's when he scooted over towards the middle. Edna done jumped out of the truck and took off through the fields or down the path out there. And so, and so, he scooted over towards the middle of the seat and he reached inside of his coat, like I guess he had a gun or something. That's what I thought. And so, I shot. And then, he fell over and I guess I shot again. He rolled out of the truck. So, I walked around the truck I guess. I don't know whether I went around or through it, and I shot again. I don't know how many times. It could've been once or twice. I don't really know how many times. And then, I left and I caught up with Edna on foot and got her and went back to the car. Got in the car and left. I went down to the filling station or the store and got a coke. And I went on down to River Road and threw the gun away out, out in the river. And I dropped Edna back off at Aunt Rosetta's. I dropped her off around the corner from Aunt Rosetta's. Then, I went back down. I told her I was gonna get a drink or something. And then, I went back down to the scene where the murder happened. I tried to pick Bill Dupin up and put him back in the truck. I couldn't lift him. So, I drug him over the side of the cliff towards the river. And I started his truck and backed it up and put it in gear and let it run over the side. And I left. I came back, picked Edna up at her Aunt Rosetta's and her things and came back home.

"Wilson Okay.

"Smith I, I left the part where I took the twenty-six cents that fell out of his pocket and his billfold, which it only had his driver's license and another card. A piece of paper or something. There was no money in the billfold.

"Wilson Okay. Bill, let me ask you. Why did you kill Bill Dupin?

"Smith Because I was tired of him coming around Edna with his tolu trying to sell it and get it and to get, get her to

go to bed with him for the tolu, cause she's pregnant with my baby. And I was plannin' on marrying her. I just got tired of it. Tired of seeing him do all these things, plus he's been taking other women and doing the same thing down the same places. I just got tired of ... tired and mad. I guess halfway crazy whenever I just seen him around there. And I knew, knew he was gonna be doing something like that."

Edna Thompson, in her statement, admitted being with Dupin under the bridge and described the shooting by appellant.

At the trial the appellant and Edna Thompson each repudiated their statements and claimed they were pressured by the interrogation into making untrue statements. Both denied any connection with the murder.

■ We see no reasonable basis in the evidence to justify an instruction on first-degree manslaughter. Such an instruction is appropriate when there is evidence to indicate that a homicide was committed while acting under extreme emotional disturbance. Appellant contends that his discovery of Dupin, with his trousers down in the truck with Edna, caused him to be emotionally disturbed, half-crazed as he put it.

We have defined extreme emotional disturbance as follows:

"Extreme emotional disturbance may reasonably be defined as follows: Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be."

*McClellan v. Commonwealth,* Ky., 715 S.W.2d 464 at 468–469 (1986).

Of course the appellant at trial denied the shooting. The jury did not believe him, but obviously did believe the statements that he and Edna made to the police shortly after the homicide. Nothing in those statements indicate a temporary state of mind or one so disturbed or inflamed as to overcome appellant's judgment and cause him to act uncontrollably. His conduct was planned because he was "tired" of the way the victim had been behaving. We find no claim by the appellant that he was unable to control his actions. It is not the obligation of the Commonwealth to prove the absence of an extreme emotional disturbance. *Wellman v. Commonwealth,* Ky., 694 S.W.2d 696 (1985).

The appellant's claim that the jury should not have been instructed on wanton murder poses a more difficult question. K.R.S. 501.010 establishes four culpable mental states. They are: (1) intentionally; (2) knowingly; (3) wantonly; and (4) recklessly. K.R.S. 501.020 defines these mental states as follows:

"(1) 'Intentionally'—A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause that result or to engage in that conduct.

"(2) 'Knowingly'—A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of that nature or that the circumstance exists.

"(3) 'Wantonly'—A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware there-

of solely by reason of voluntary intoxication also acts wantonly with respect thereto.

"(4) 'Recklessly'—A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

With respect to criminal homicide, a person is guilty of murder when, with the intent to cause the death of another person, he causes the death of such person, or when under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person. K.R.S. 507.020.

A person is guilty of manslaughter in the second degree when he wantonly causes the death of another person (K.R.S. 507.-040) and guilty of reckless homicide when with recklessness he causes the death of another person (K.R.S. 507.050).

■ In homicide prosecutions a defendant is entitled to an instruction on a lesser-included offense if the evidence would permit a jury to rationally find him guilty of the lesser-offense and acquit him of the greater. *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982).

In *Hayes v. Commonwealth*, Ky., 625 S.W.2d 583 (1982), we held that it was improper to instruct on intentional murder, and alternatively on wanton murder, when all of the evidence indicated that it would be clearly unreasonable for the jury to believe that appellant's conduct was other than intentional.

Likewise, in *Baker v. Commonwealth*, Ky., 677 S.W.2d 876 (1984), we held that a defendant was not entitled to an instruction on reckless homicide when all the evidence indicated that his conduct was intentional and no evidence indicated that his conduct

was reckless. Baker sought an instruction on reckless homicide which would have been appropriate if Baker did not intend to cause the death of the victim and was, in fact, unaware of the substantial risk created by his conduct. Baker did not make any claim that he was unaware of the risk, and no reasonable jury under the circumstances could have found that he did not perceive the risk that death of the victim might result from his conduct. A reckless homicide instruction was not required in his case.

In *Gray v. Commonwealth*, Ky., 695 S.W.2d 860 (1985), we held that it was error to instruct the jury on second-degree manslaughter over the defendant's objection when all of the evidence showed that the defendant's acts were intentional and no evidence showed his conduct was wanton. *Gray* was another case where the court, considering the circumstances of that case, concluded that a jury could not have reasonably entertained a doubt of guilt of the greater offense, and thus the instruction on the lesser-included offense should not have been given over the objection of the defendant.

*Baker* and *Gray* each involved a defense of self-defense, and our decision in each case was premised upon the proposition that the use of force in self-defense is an intentional act, not a wanton or reckless one.

The precedential value of *Baker* has been eroded by our decision in *Commonwealth v. Rose*, Ky., 725 S.W.2d 588 (1987), in which we upheld a conviction of second-degree manslaughter where the defense offered was self-protection, but the defendant contended that she did not intend to cause the death of the victim. Because intentional murder requires intention to cause death, under the circumstances in *Rose*, a jury could have believed that the defendant shot her husband, believing it necessary for her self-protection, but that she did not actually intend to cause his death. The circumstances were such, however, that the jury could believe that her conduct was wanton as defined by statute

in that she was aware of and consciously disregarded a substantial risk that death would result. Thus, the instruction on second-degree manslaughter was proper.

■ As a result of the holding of the United States Supreme Court in *Price v. Georgia*, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970), the conviction of a defendant of a lesser-included offense constitutes an acquittal of all higher degrees of the offense. *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). Accordingly, if the conviction of the lesser-included offense is reversed on appeal, the defendant cannot be retried upon any other higher degrees of the offense. See also, *Gunter v. Commonwealth*, Ky., 576 S.W.2d 518 (1978).

As a result of the holding of the United States Supreme Court in *Burks v. U.S.*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), if a conviction is reversed upon appeal upon the ground that the evidence was not sufficient to sustain the conviction, the defendant cannot be retried for that offense by reason of being placed in jeopardy twice. See also, *Hon v. Commonwealth*, Ky., 670 S.W.2d 851 (1984).

In the case at bar, the appellant contends that his conviction of wanton murder has the effect of acquitting him of intentional murder, and he can never be retried on that charge. He further contends that his conviction for wanton homicide must be reversed because all of the evidence indicates that his action was intentional and not wanton. It is his position, therefore, that under the law of Kentucky he is entitled to go entirely free, even though the jury was convinced beyond a reasonable doubt that he had unjustifiably caused the death of another person. Although there is a certain logic to appellant's contention, it leads to an absurd result, and one which is completely unjustified by the facts of the case.

The Model Penal Code upon which the Kentucky Penal Code was patterned provides that when wantonness, as that term is defined in K.R.S. 501.020, suffices to establish an element of the offense, such element is also established if a person acts intentionally. Model Penal Code § 2.02(5); 10 U.L.A. 466 (1962).

■ A homicide caused by wanton conduct is, at the very least, manslaughter in the second degree. If the jury finds that in addition to the wanton conduct of the defendant, the circumstances surrounding his conduct manifest an extreme indifference to human life, the offense is elevated to wanton murder. If, in addition to the wanton conduct and circumstances which manifest an extreme indifference to human life, the jury finds that the defendant intended to cause death, the offense is intentional murder.

■ A defendant is entitled to an instruction on a lesser-included offense if the evidence would permit a jury to rationally find him guilty of the lesser-offense and acquit him of the greater. *Hopper v. Evans, supra.* It follows that the giving of an instruction on lesser-included offenses when the evidence would permit a jury to rationally find a defendant guilty of the lesser-included offense and acquit him of the greater offense is not erroneous, even if given over the defendant's objection.

■ Whether a defendant actually has an intent to kill is a subjective matter. A defendant may be presumed to intend the natural and probable consequences of his act, and thus a jury is entitled to find an intent to cause death from an act of which death is a natural and probable consequence.

■ Even though a jury may legitimately find intent to cause death from actions of which death is a natural and probable consequence, it is not always required to so find. Even when death is a natural and probable consequence of an act, there may exist circumstances which make it reasonable for the jury not to be convinced beyond a reasonable doubt that the defendant intended to cause death. In such a case, the jury can rationally convict a defendant of a lesser-included offense and acquit him of the greater offense of intentional murder.

At common law a charge of murder embraced all the lower degrees of culpable

homicide. Some jurisdictions still follow this same line of reasoning today, and hold that every charge of murder necessarily includes the lesser-included offenses. *State v. Ellis*, 70 Idaho 417, 219 P.2d 953 (1950); *State v. Huett*, 340 Mo. 934, 104 S.W.2d 252 (1937); *Perkins v. State*, 299 Miss. 299, 90 So.2d 650 (1956). Under this theory, the jury may find a defendant guilty of a lesser-included offense, even though there is no evidence to support the lesser rather than the greater crime if the evidence is sufficient to support a verdict of guilty of the greater degree of the offense charged. *State v. Morrison*, 52 Idaho 99, 11 P.2d 619 (1932); *Commonwealth v. Steele*, 362 Pa. 427, 66 A.2d 825 (1949); *Killen v. State*, 92 So.2d 825 (Fla.1957). The jury's right to convict of the lesser offense arises from two common law doctrines. The doctrine of lesser-included offenses and the related common law concept that the jury can consider such things as sympathy and extenuating circumstances when making their decision. *Commonwealth v. Schaller*, 493 Pa. 426, 426 A.2d 1090 (1980).

Some jurisdictions follow a variation on this theory and hold that it is error to instruct the jury on lesser-included offenses not supported by the evidence, but it is a harmless error because it is to the defendant's benefit that the jury convicted him of the lesser offense rather than of the higher offense of which he could have been convicted under the evidence. *State v. Chambers*, 21 N.C.App. 450, 204 S.E.2d 560 (1974); *Guy v. State*, 395 So.2d 161 (Ala.Cr. App.1981): *State v. Jeffries*, 55 N.C.App. 269, 285 S.E.2d 307 (1982); *McMullin v. State*, 187 Ark. 1163, 60 S.W.2d 177 (1933); *Grace v. State*, 379 So.2d 540 (Miss.1980); *State v. Walker*, 34 N.C.App. 450, 238 S.E.2d 666 (1977).

In some jurisdictions which generally find instructions on lesser-included offenses not supported by the evidence to be harmless error, there is an exception when the evidence is such that a defendant would either be convicted of the higher-degree offense or be acquitted because of a defense or justification. *State v. Ray*, 299 N.C. 151, 261 S.E.2d 789 (1980); *People v. Kelly*, 322 N.E.2d 527, 27 Ill.App.3d 1018 (1975). Many courts which follow this theory are concerned that the jury might reach a compromise verdict.

"It is only where the evidence establishes that defendant is guilty of murder or is not guilty, as for example in cases in which the defense is alibi or mistaken identity, that a defendant may be said to have a right not to have the jury charged as to lesser included offenses."

*Kelly, supra* at 532.

■ In Kentucky the offense of murder may be committed with either of two culpable mental states, intentional or wanton. Wanton murder, however, is not a lesser-included offense of murder. It is simply murder committed with a different state of mental culpability, but murder, whether intentional or wanton is a capital offense.

■ As the appellant has pointed out in his brief, there is much evidence in this case to indicate that the homicide was intentional rather than wanton. Nevertheless, we have concluded that the instruction on wanton murder, even if erroneously given, was a harmless error and resulted in no prejudice to appellant.

Appellant's claim that the evidence was not sufficient to establish wanton conduct on his part because the act was intentional rather than wanton is without merit. He cannot establish prejudice by showing that he was subjected to a greater penalty because the penalty options for intentional murder and wanton murder are the same, and it defies reason to contend that a jury may have imposed a lesser penalty for intentional murder than it imposed for the wanton murder.

Neither can the appellant claim prejudice from the likelihood of a compromise verdict in that the jury was unwilling to convict him of a higher offense, but rather than see him go free, was willing to convict him of a lesser offense and impose a lesser penalty.

The jury was convinced beyond a reasonable doubt that appellant caused the death of Bill Dupin. He was found guilty of murder, and he has not been prejudiced by

the fact that the jury chose to believe that his conduct was wanton under circumstances that manifested an extreme indifference to the value of human life rather than to believe that he intended to kill the victim.

The judgment is affirmed.

STEPHENS, C.J., and GANT, LAMBERT, STEPHENSON, VANCE and WINTERSHEIMER, JJ., concur.

LEIBSON, J., dissents by separate opinion.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

As a published opinion, this case serves to spread the confusion surrounding jury instructions generated by *Baker* and *Gray*, and then compounded by the definition of "extreme emotional disturbance" offered in *McClellan*. *Baker v. Commonwealth*, Ky., 677 S.W.2d 876 (1984); *Gray v. Commonwealth*, Ky., 695 S.W.2d 860 (1985); and *McClellan v. Commonwealth*, Ky., 715 S.W.2d 464 (1986).

The fallacy in the *Baker* and *Gray* cases is that they order the trial court to pigeonhole the evidence regarding an accused's mental state, sticking it under one offense or another, when, more often than not, this is an impossible task. It is much more sensible to realize that when a homicide occurs the permissible inferences regarding the mental state of the killer are often confused and overlapping, subject to multiple interpretations. As stated in *Commonwealth v. Rose*, Ky., 725 S.W.2d 588, 592 (1987):

"Notwithstanding the language in *Gray*, there may be, as there is in this case, evidence supporting either view, self-defense or wantonness, depending on how the jury should view the evidence....

Very often, as in this case, the fact of killing is unambiguous but the accused's mental state at the time of the killing presents a mixed picture."

Our court should recognize that KRS Chapter 507, *Criminal Homicide*, distinguishes between various offenses, and necessarily so, on the basis of abstract descriptions of states of mind, whereas the evidence in homicide cases often presents a confused mental picture that defies classification for purposes of instructions. The approved practice in homicide cases in this jurisdiction until the advent of *Baker* and *Gray*, and the better practice, was for the trial court's instructions to present the jury with a menu of offenses, covering every arguable mental state, conflicting or not, and let the jury, as a trier of fact, decide which offense best described the circumstances of the killing. *Blake v. Commonwealth*, Ky., 607 S.W.2d 422 (1980).

As attested by the present opinion, the opposite approach simply creates confusion and then compounds it. On the one hand, the majority opinion approves the trial court's decision to instruct on two different mental states for murder, intentional and wanton, mental states which are conflicting as an abstract proposition. On the other hand, the majority opinion then approves the trial court's refusal to instruct on Manslaughter I, an offense which is at least as apt a description of the accused's mental state at the time of the killing as wanton murder, if not more so.

There was evidence from which the jury could believe that when the accused committed the crime he was enraged, driven "halfway crazy" by a tormentor who was using the offer of drugs to repeatedly seduce his pregnant girlfriend, the woman he loved and intended to marry. The long, rambling statements of the appellant, Bill Dee Smith, and the girlfriend, Edna Thompson, and the highly charged emotional circumstances at the fatal moment when the crime was committed, i.e., the totality of circumstances, was at least as consistent with the picture of voluntary manslaughter (KRS 507.030(1)(b) as it was with wanton murder. Using the "pigeonhole" method from *Baker* and *Gray*, the trial court would be correct had it instructed on one homicide theory or another, but not both. Using a more sensible approach, the trial court was correct in instructing on both intentional and wanton murder, but then it was also required to instruct on voluntary manslaughter as requested by the accused.

Certainly it was inconsistent to use two different approaches, instructing on different theories of murder but excluding voluntary manslaughter.

Ignoring this inconsistency, we have affirmed both the trial court's multiple approach to instructions covering two different states of mind for murder, intentional and wanton, and also affirmed denying the accused the benefit of the same multiple approach to mental states when he requested an instruction on voluntary manslaughter. This glaring inconsistency may well strike the impartial observer as result oriented.

We require the appellant to accept as a rationale that there was no evidence from which to conclude that the appellant was "under the influence of extreme emotional disturbance," the factor that reduces intentional murder to first-degree manslaughter. On the contrary, this label is as readily suggested by the evidence as is a wanton state of mind, if not more so. I would agree that the evidence falls short of circumstances inferring a state of insanity, but I continue to disagree that a reasonable interpretation of the term "extreme emotional disturbance" requires that the accused act "uncontrollably," if this means a mental condition so severe that one is completely incapable of conforming one's conduct to the requirements of law. This is the definition of insanity in KRS 504.060, and not of extreme emotional disturbance. As stated in my concurring opinion in *McClellan v. Commonwealth, supra* at 474:

> "When the statute declares that being 'under the influence' of 'extreme emotional disturbance' is sufficient to *mitigate* criminal liability, it seems apparent that the legislature intended for the defendant to be able to utilize it 'in mitigation' so long as it *contributes* to cause the act, rather than limiting its application to where it is an exclusive cause of the criminal act.... The statutory scheme does not require that extreme emotional disturbance be the sole or exclusive cause of the act, as the word 'uncontrollably' seemingly implies."

We seem to have come to a definition of "extreme emotional disturbance" which is so narrow as to render the term non-existent. There was ample evidence in the present case from which to conclude that the accused was emotionally disturbed, and extremely so. The trial court's refusal to instruct on this theory left the jury with a choice between only intentional and wanton murder. It is not difficult to understand why the jury opted for "wanton" as better describing the accused's state of mind than "intentional," even though, strictly speaking from a legal standpoint it is impossible to square this use of the term wanton behavior with our decision in *Gray v. Commonwealth, supra.* At least the term "wanton" here fits a lay person's concept of the circumstances of the killing, if not our own previous definition.

We ought to instruct our trial courts to avoid pigeonholing evidence raising inferences about complex mental states into one offense or another, and instead give the jury a full range of instructions covering every arguable conclusion.

This case should be reversed because of the trial court's failure to instruct on Manslaughter I.